IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SENTINEL INSURANCE COMPANY, LTD.,   )
                                    )
              Plaintiff,            )
                                    )
        v.                          )         1:19-cv-1395 (LMB/TCB)
                                    )
VLM FOODS, INC., et al.,            )
                                    )
              Defendants.           )

MEMORANDUM OPINION

On June 25, 2021, the Court ruled from the bench on the parties' multiple dispositive

motions in this multi-party complex civil action which centers around a 2016 outbreak of

hepatitis A virus ("HAV") infections linked to consumption of frozen strawberry smoothies sold

by Tropical Smoothie Café, LLC ("TSC").  This Memorandum Opinion further explains and

fully develops the record supporting that ruling.

Plaintiff Sentinel Insurance Company, Ltd. ("plaintiff" or "Sentinel")[1] insured TSC and

incurred extensive attorney's fees and costs in defending TSC in more than 25 lawsuits arising

out of the HAV outbreak and in paying some settlements.  In its two-count Third Amended

Complaint ("the complaint") [Dkt. No. 131], Sentinel seeks express indemnification for those

fees, costs, and payments from defendants VLM Foods, Inc. ("defendant" or "VLM"), a

Canadian entity, and Patagonia Foods, LLC ("defendant" or "Patagonia"), a Californian entity.

Both entities were upstream links in the frozen strawberry distribution chain.  In the alternative,

if judgment is not entered on Count I, Count II seeks a finding that Sentinel is entitled to be

reimbursed by the defendants for the same costs under the doctrine of equitable subrogation.

---

[1] Plaintiff also refers to itself as "Hartford" in its memoranda.

The two defendants have crossclaimed against each other, seeking indemnification for any damages they may have to pay Sentinel if Sentinel prevails, and also seeking reimbursement for their attorney's fees and expenses incurred in this litigation.[2] [Dkt. Nos. 42 and 89].

There are five motions at issue. Sentinel has filed a Motion for Summary Judgment [Dkt. No. 209] which seeks summary judgment only as to Count I, the claim for express indemnity, against both defendants. In turn, Patagonia has filed a cross-motion for summary judgment against Sentinel on both Counts I and II of the complaint, [Dkt. No. 200], and a motion for summary judgment against VLM on Patagonia's crossclaim, which seeks indemnification from VLM for any liability Patagonia may have to Sentinel.[3] [Dkt. No. 203]. VLM has filed a cross-motion for summary judgment against Sentinel seeking a judgment in its favor on both counts of Sentinel's complaint as well as seeking reimbursement from Sentinel for its attorney's fees and costs incurred in defending against Sentinel's claims. [Dkt. No. 210]. VLM has also filed a

---

[2] In its amended crossclaim and third-party complaint, Patagonia also sought indemnification against VLM Foods USA, Inc. and The International Company for Agricultural Production and Processing ("ICAPP"). [Dkt. No. 42]. VLM Foods USA, Inc. is VLM's U.S.-based affiliate corporation, and ICAPP is the Egyptian entity from which the strawberries were sourced. Id. During oral argument, counsel agreed that VLM Foods USA, Inc. was mostly a shell company and is not responsible for any of the conduct at issue. [Dkt. No. 268] Hearing Tr. at 16:20-17:15. The record does not show that ICAPP or VLM Foods USA, Inc. were ever served. Therefore, all claims against these entities will be dismissed.

[3] It appears that Patagonia is only seeking summary judgment on its claim that VLM is required to indemnify Patagonia for any liability that Patagonia has to Sentinel and is not moving to recover its attorney's fees and costs incurred in defending this matter. Specifically, Patagonia states that:

> Patagonia is not attempting (at least at this point) to seek its own fees in enforcing the agreement – it is seeking to pass on to VLM a liability for Sentinel's fees that, if recovered, would be damages incurred by and recovered against Patagonia as a direct result of VLM failing to comply with the indemnity provision at issue and which VLM agreed to hold Patagonia harmless against.

[Dkt. No. 253] Patagonia Reply Memorandum at 9.

2

motion for summary judgment against Patagonia on Patagonia's crossclaims for express and equitable indemnity.[4] [Dkt. No. 212]. For the reasons discussed in open court and in this Memorandum Opinion, Sentinel is entitled to summary judgment in its favor jointly and severally against the defendants, and Patagonia is entitled to summary judgment in its favor as to VLM. This Memorandum Opinion will also clean up several issues not resolved during oral argument.

## I. BACKGROUND

1. Procedural History

Sentinel filed its original complaint on November 1, 2019 and has since amended it three times; the third amended complaint—which is at issue—was filed on August 21, 2020. In each instance, any then-pending motions to dismiss were denied without prejudice. Patagonia filed its original crossclaim on January 6, 2020, and its first amended crossclaim on February 25, 2020. VLM filed its crossclaim on July 14, 2020. On June 30, 2020 the Court denied all three motions to dismiss brought by VLM and Patagonia [Dkt. No. 85], and the parties engaged in discovery as well as significant efforts to settle this dispute, which to date have been unsuccessful.

In this action, Sentinel "seeks to prosecute [TSC's] right[s]" of recovery against VLM and Patagonia. [Dkt. No. 131] Third Amended Complaint at ¶ 1. In Count I, Sentinel seeks recovery under a theory of "Express Indemnity," based on its insurance policy covering TSC and three agreements: the VLM-Patagonia agreement, the Patagonia-Sysco agreement, and the

---

[4] No party has filed a dispositive motion regarding VLM's crossclaim against Patagonia. In its motion for summary judgment against Patagonia, VLM only seeks summary judgment as to Patagonia's crossclaim against VLM, but does not seek a judgment in its favor on its crossclaim for indemnification from Patagonia. As such, the parties will be directed to clarify the status of VLM's crossclaim.

Patagonia-ITI agreement. Id. ¶¶ 57-66. In the alternative, Count II seeks recovery under "Subrogation," which is "a device of equity designed to obtain an equitable adjustment between the parties by securing the ultimate discharge of a debt by the person who in equity ought to pay it." Id. ¶¶ 67-71; Branch Banking & Tr. Co. v. Witmeyer, No. 3:10-cv-55, 2011 WL 3297682, at *12 (E.D. Va. Jan. 6, 2011) (quoting Collins v. Blue Cross of Va., 193 S.E.2d 782, 784 (Va. 1973), abrogated on other grounds, Reynolds Metals Co. v. Smith, 241 S.E.2d 794, 796 (Va. 1978)); see also Deutsche Nat. Bank Tr. Co. v. Batmanghelidj, No. 1:07-cv-683, 2007 WL 2713109, at *5 (E.D. Va. Sept. 17, 2007) ("The Virginia doctrine of equitable subrogation is intended to apply in the 'instance in which one person, not acting voluntarily, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.'" (quoting Fed. Land Bank v. Joynes, 18 S.E.2d 917, 920 (Va. 1942))).

    2. Sentinel Insurance Policy

Sentinel issued Policy No. 20 SBA RB0935 to TSC for annual policy periods beginning on August 15, 2015 and ending August 15, 2017, under which Sentinel defended TSC against the HAV claims and paid a few claims. [Dkt. No. 214] Sentinel Exs. 6 and 7. Condition 8(a) of the Policy, titled Transfer of Rights of Recovery, provided:

> If the insured has rights to recover all or part of any payment, including Supplementary Payments, we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them....

[Dkt. No. 214] Sentinel Exs. 6 and 7. Accordingly, although there is some dispute about whether Sentinel voluntarily incurred the litigation costs and fees at issue, the Court finds that under the terms of the insurance policy, Sentinel stands in the shoes of TSC for purposes of this lawsuit, in which Sentinel now seeks to recover $3,548,292.90, comprised of $3,342,989.41 in attorney's fees it incurred in defending TSC against the underlying HAV claims, $187,636.82 in associated

litigation expenses, and $17,666.67 it paid to resolve three underlying HAV claims, as well as prejudgment interest on these amounts. [Dkt. No. 269]. Although VLM opposed the damage amount in its motion for summary judgment as to Sentinel's complaint, during oral argument it admitted that it was not contesting the amount.[5]  Patagonia has not contested the amount.

### 3.   Distribution Chain

TSC is a nationwide franchisor of cafes specializing in smoothies.  TSC created the supply and distribution chain for the frozen strawberries at issue in this civil action.  [Dkt. No. 214] Sentinel Ex. 30 at 9 (Item 8), 31-32; Sentinel Ex. 18, Watson Dep. at 59:8-61:2.  TSC franchise agreements and documents require TSC franchisees to purchase frozen fruit in accordance with the guidelines, specifications, and approved supplier, distributor, and vendor lists issued by TSC.  [Dkt. No. 214] Sentinel Ex. 30 at 9, 31-32.  TSC's CEO described the distribution chain as follows:

> I'm going to take you from the Cafe level, i.e., a delivery is made to the Cafe, and I'll work backwards. . . .
> . . .
>
> The Cafe—the Cafe is delivered to by SYSCO, right.  They're on the trucks delivering the product.  Behind them is a group called ITI Kinexco, which we brought into the supply chain as basically a pass through, a distributor for us, which we negotiated to keep the . . . service high and the . . . pricing down for our franchisee, acting in our capacity as a franchisor to provide them high quality product at a . . . lower price.  Their product was delivered from Patagonia Foods. And at the time I did not know this, but subsequently I have learned that behind Patagonia—which I was not concerned with, because my only concern was getting the product that we need at the specs we required from Patagonia—my understanding post this incident . . . is that there's an importer of record, VLM, that went out and was the importer of record of the strawberries, which they . . . had gotten from a group in Egypt called ICAPP.  So if I were to run that supply chain backwards, the part past Patagonia that I was not aware of at the time, but I am subsequently now aware, is from Egypt, ICAPP, to VLM, importer of record, to

---

[5]  At oral argument, the Court asked, "[I]s there a genuine dispute over the amount that's being sought in this case?"  VLM's counsel answered, "No, Your Honor."  [Dkt. No. 268] Hearing Tr. at 11:22-12:7.

Patagonia under purchase and sale POs between VLM and Patagonia, Patagonia to
ITI Kinexco as a pass through distribution warehousing, that product then goes to
SYSCO where it is stocked at SYSCO for distribution to our Cafes.  So that's
backwards and forward through the supply chain as I understand it.

[Dkt. No. 214] Sentinel Ex. 18, Watson Dep. at 59:8-61:2.

Patagonia is a California limited liability company that acts as a wholesale seller of

frozen produce, including frozen strawberries.  [Dkt. No. 201] at 3.  Its principal place of

business is San Luis Obispo, California.  Id.  Since 2006, Patagonia has sourced roughly 100

million pounds of frozen fruits, including strawberries, for TSC, which is equivalent to roughly

$100 million of business.  [Dkt. No. 214] Sentinel Ex. 9, Bernstein Dep. at 21:19-22:6, 26:6-21.

Patagonia also helped TSC by identifying product specifications, negotiating with production

plants to get the best pricing, providing financing and quality assurance functions, moving and

storing product at the U.S. border, sending inventory to Sysco warehouses, and reviewing and

coordinating electronic orders.  [Dkt. No. 214] Sentinel Ex. 9, Bernstein Dep. at 30:3-34:1.  For

the past fourteen years, Patagonia has met with TSC's CEO, management, and/or supply chain

director at TSC's corporate headquarters "[n]ormally twice a year."  [Dkt. No. 214] Sentinel Ex.

9, Bernstein Dep. at 36:17-38:2.  Although during the period at issue there was no formal written

agreement between them,[6] Patagonia and TSC regularly communicated, negotiated, and reached

---

[6] Charles Watson ("Watson"), the current CEO of TSC (he was previously Chief Development
Officer, then became acting CEO in 2018 and permanent CEO in 2019), testified in his
deposition that in January through August 2016, there was no written agreement between
Patagonia and TSC:

> Now remember, we had . . . at least, gosh, probably an eight year [sic] track record
> working with Patagonia, so we had been in business together for a long time.  But
> I do not believe we had a master distribution agreement at that time.  We—we had
> been working so well together for the past eight years that we . . . thought status
> quo would be fine.

6

agreements regarding food product specifications and details, quality control issues, their business relationship, the policies and procedures that applied to that relationship, TSC's supply chain and distribution needs, Patagonia's ability to fulfill those needs, projections of TSC's annual use of frozen fruits, frozen fruit pricing, TSC's marketing efforts, potential new menu items for TSC to provide its franchisees, and the general state of the frozen fruit industry. [Dkt. No. 214] Sentinel Ex. 9, Bernstein Dep. at 27:21-40:11, 62:10-13. Patagonia does not have these types of business communications with TSC franchisees. [Dkt. No. 214] Sentinel Ex. 9, Bernstein Dep. at 61:4-7, 62:17-20.

In 2015, TSC and Patagonia entered into a written bulk purchasing arrangement for frozen strawberries under which Patagonia agreed to supply a particular type of strawberry for use in TSC's franchises, which included the frozen strawberries at issue in this civil action.[7] [Dkt. No. 214] Sentinel Ex. 22 (TSC Product Specification signed by Patagonia on 4/30/2015). To fulfill this arrangement, on September 14, 2015, Patagonia sent VLM—a global frozen food vendor, processor, and distributor based in Canada—a purchase order for 60 loads of individually quick-frozen strawberries from Egypt. [Dkt. No. 214] Sentinel Ex. 26, (Email from Elias (Patagonia) to Nodzynski (VLM) dated 9/14/2015 attaching a purchase order); [Dkt. No. 131] ¶¶ 3, 10. The purchase order included the following statement:

> Please note this product to be sold through distribution to a foodservice chain accounts [sic]. Complaints regarding the quality of the fruit may not be known for 60 - 90 days or longer after the product arrives at our warehouse. Therefore packers providing fruit for our programs will need to stand behind the quality of their

---

[Dkt. No. 214] Sentinel Ex. 18, Watson Dep. at 69:15-70:4. Patagonia and TSC did have a product specification form for the frozen strawberries that was signed by Patagonia on April 30, 2015. [Dkt. No. 214] Sentinel Ex. 22.

[7] The parties dispute whether the frozen strawberries purchased by Patagonia were the ones that caused the HAV outbreak, but there is no dispute that this batch of strawberries was at least alleged by consumers to have caused the HAV outbreak.

product and provide financial support to cover only actual costs in the event of any claims.

[Dkt. No. 214] Sentinel Ex. 26.  That same day, VLM sent Patagonia an executed sales confirmation for the 60 loads (3.168 million pounds) of frozen strawberries.  [Dkt. No. 214] Sentinel Ex. 27 (VLM Consolidated Sales Confirmation dated 9/14/2015).

VLM, in turn, purchased the frozen strawberries from ICAPP in 2015 and 2016.  [Dkt. No. 222] Sentinel Ex. 48 (VLM Answer to Requests for Admissions ("RFA")) at RFA 10.  ICAPP arranged for delivery of multiple shipments of cold storage shipping containers of frozen strawberries to Norfolk, Virginia.  Id.  VLM was the importer of record through customs in Norfolk, Virginia and arranged for delivery in 2016 of the cold storage shipping containers of frozen strawberries from the port in Norfolk, Virginia to warehouses designated by Patagonia.  Id.

TSC arranged for ITI to provide TSC with supply chain logistics and redistribution services, including delivering the frozen strawberries purchased from Patagonia to Sysco Corporation ("Sysco") warehouses.  See [Dkt. No. 214] Sentinel Ex. 8, Eberhard Dep. at 29:4-30:2; 54:7-17; Ex. 25 (Email from Davis-Smith (Sysco) to Sysco "OPCO's" 6/03/2015).  Under the TSC-ITI Supply Chain Solutions Services Agreement, TSC had to approve the items that ITI would supply to the distributors in its supply chain, like Sysco, and TSC had to provide a weekly volume projection for each product that ITI would to supply to TSC's distributors. [Dkt. No. 214] Sentinel Ex. 5 (ITI Supply Agreement) at ¶¶ 2, 4.

TSC had a contract with Sysco, under which Sysco and its operating entities delivered the frozen strawberries to TSC franchises.[8] Pursuant to the terms of the TSC-Sysco January 18, 2016 Amended and Restated Master Distribution Agreement ("Sysco Distribution Agreement"), TSC, which was defined as a "Primary Customer" of Sysco, appointed Sysco to serve as its primary distributor of food products to TSC franchisees, who were required to purchase a set significant minimum amount of products from Sysco.[9] [Dkt. No. 214] Sentinel Ex. 3 (Sysco Distribution Agreement).  TSC franchisees purchased frozen strawberries and other products from Sysco on an as-needed basis.  Id.; Ex. 11, Davis-Smith Dep. at 29:16-31:25;[10] Ex. 18,

---

[8] Alexander Eberhard, the Vice President of Patagonia, testified in his deposition that the process by which TSC orders strawberries through Patagonia

> starts with Tropical Smoothie corporate after a negotiation is made with—with Patagonia Foods.  They make that information available to their franchisees.  Their franchisees order product from their local Sysco distributor, and that Sysco distributor gets product from a redistributor.  In this instance, it's ITI….

[Dkt. No. 214] Sentinel Ex. 8, Eberhard Dep. at 29:9-29:24.

[9] The actual dollar amount is under seal.  [Dkt. No. 195] Ex. 3 at Schedule 3.

[10] Amy Davis-Smith, the Vice President of National Accounts Business Development at Sysco, testified in her deposition that the process by which a TSC franchisee placed orders for goods with Sysco was as follows:

> A: They would place goods [sic] on an online platform with a designated order guide that they, you know, decided, I need a case of cups on my delivery tomorrow, so I'm going to click on one case of cups or two cases of cups that I need.  I need, you know, bleach tomorrow.  I'm going to click on those.  They get routed through our system. . . .
>
> . . .
>
> Q: And was it indeed customized to Tropical Smoothie?
>
> A: Yes, sir.
>
> . . .
>
> Q: And in that customization process, does Sysco consult with Tropical Smoothie, the franchisor?

Watson Dep. at 59:8-61:2.  As the Primary Customer, TSC was responsible for paying Sysco for

any unused products, including frozen strawberries, that Sysco purchased for distribution to

TSC's franchises.  [Dkt. No. 214] Sentinel Ex. 11, Davis-Smith Dep. at 76:19-77:11.

4.  HAV Outbreak

In the late summer and early fall of 2016, several state health agencies, the Centers for

Disease Control and Prevention ("CDC"), and the U.S. Food & Drug Administration ("FDA")

(collectively, "public health officials") identified and investigated an HAV outbreak.  [Dkt. No.

222] Sentinel Ex. 44 (FDA Incident Summary);[11] [Dkt. No. 131] (Third Amended Complaint) ¶

40; [Dkt. No. 137] (Patagonia Answer) ¶ 40; [Dkt. No. 136] (VLM Answer) ¶ 40.  Public health

officials identified 129 individuals—54 of whom were hospitalized—who acquired HAV

infections as a result of consuming smoothies or other food items purchased from certain TSC

locations that were made from or exposed to frozen strawberries.  [Dkt. No. 222] Sentinel Ex. 44

(FDA Incident Summary) at SENT033555.  No deaths were identified.  Id.  The FDA tested 19

samples of strawberries, six of which originated from ICAPP and tested positive for HAV.  Id. at

SENT033554-56.  The FDA's trace-back investigation concluded that the frozen strawberries

served at the implicated TSC franchisees originated from ICAPP.  Id. at SENT033556, 033558;

see also [Dkt. No. 131] ¶ 43; [Dkt. No. 137] ¶ 43; [Dkt. No. 136] ¶ 43.  In October 2016, ICAPP

---

A: Yes. We did consult with them and they ultimately had executive-level decision-making of how they wanted their franchisees to be able to order and what would be available on those order guides.

[Dkt. No. 214] Sentinel Ex. 11, Davis-Smith Dep. at 29:16-30:24.

[11] VLM "acknowledges that several state health agencies, the CDC, and the FDA identified and investigated a hepatitis A virus outbreak" but "objects to the use of the FDA Incident Summary," arguing that it is inadmissible for several reasons. [Dkt. No. 243] ¶ 1. The Court finds those arguments irrelevant, because, as discussed below, Sentinel does not need to prove that these particular strawberries caused the outbreak.

voluntarily recalled frozen strawberries imported into the United States starting January 1,

2016.[12]  [Dkt. No. 222] Sentinel Ex. 44 at SENT033558; see also [Dkt. No. 131] at ¶ 43; [Dkt.

No. 137] at ¶ 43; [Dkt. No. 136] at ¶ 43; [Dkt. No. 214] at Ex. 37 (Email from Bernstein

(Patagonia) forwarding and attaching ICAAP recalls dated 09/27/2016).

        As a result of this HAV outbreak, dozens of state court lawsuits and two federal class

actions were filed, and over 200 claims were asserted against TSC and various TSC franchisees.

[Dkt. No. 214] Sentinel Ex. 43 (Exemplar Virginia Multiple Claimant Act status report listing

HAV Claims); Ex. 53.[13]  The claimants alleged that TSC exposed them to HAV through TSC

---

[12] In an email to an FDA administrator, Mark FeDuke, the director of operations and regulatory affairs at VLM, acknowledged:

> Having identified a unique commonality with respect to the Virginia outbreak — namely, product uniquely originating from a specific farm that was only used for the production of frozen strawberries supplied to Patagonia that were processed and delivered within the time period of interest — it is those specific lots that would be subject to recall by ICAPP. . . .

> As previously mentioned — in exercising further abundance of caution — all products processed at ICAPP in Jan-Feb (regardless of the farm from which they originated) and which were shipped to the Virginia market will be withdrawn by ICAPP. . . .

[Dkt. No. 214] Sentinel Ex. 36.  VLM objects to Sentinel's reliance on ICAPP's voluntary recall because the recall was a subsequent remedial measure, but Sentinel correctly argues that evidence of subsequent remedial measures may be admitted where those measures were taken by a third-party not involved in the litigation—here, ICAPP. See TLT-Babcock, Inc. v. Emerson Elec. Co., 33 F.3d 397, 400 (4th Cir. 1994) ("The courts of appeals . . . have held that evidence of subsequent repairs may be admitted where those repairs have been performed by someone other than the defendant" (collecting cases)).

[13] VLM objects to Sentinel's exhibit 53, which is a summary of the allegations made by claimants in demand letters and lawsuits based on the HAV outbreak.  The summary was prepared at the direction of TSC's expert witness, Barry Trebach, and along with the voluminous records summarized therein, was produced to VLM and Patagonia during discovery.  VLM objects to its inclusion in the summary judgment record, arguing that it is not relevant; "its probative value is substantially outweighed by the danger of unfair prejudice in confusing the issues, misleading the jury, undue delay, wasting time, [and] needlessly presenting cumulative evidence; it relates to subsequent remedial measures; it amounts to opinion testimony by a lay

franchisees' use of contaminated strawberries and sought to recover damages for bodily injury sustained from consuming or being exposed to products contaminated with HAV that were sold by TSC franchises. Some of these claims were also asserted against VLM and Patagonia, among other defendants, and some did not include TSC as a defendant. [Dkt. No. 243] ¶ 10. Other claims were asserted only against TSC and its franchisees, and some alleged negligence or fraudulent concealment, claiming that prophylactic treatment would have prevented the plaintiffs from contracting HAV had TSC timely provided information to the public. TSC tendered all of the HAV claims asserted against it and its franchisees to Patagonia and VLM under the hold harmless agreements at issue in this litigation. [Dkt. No. 222] Sentinel Ex. 50 at RFA 13 (Patagonia admission); Ex. 51 (Patagonia admission) ¶ 3; Ex. 8, Eberhard Dep. at 80:10-81:24; [Dkt. No. 131] at ¶ 62 (Sentinel Third Amended Complaint); [Dkt. No. 136] at ¶ 62 (VLM Answer to Third Amended Complaint). During oral argument, VLM admitted that it ultimately paid most of the claims, [Dkt. No. 268] Hearing Tr. at 7:7-9:18; however, neither Patagonia nor VLM paid the attorney's fees and litigation expenses TSC incurred in defending against the HAV lawsuits. These fees were paid by Sentinel, which also paid a few settlements. The recovery of these litigation expenses, settlement amounts, and the litigation expenses incurred in the instant lawsuit are at issue in this civil action.

---

witness; it is hearsay not subject to any exceptions or otherwise admissible; [and] it does not meet the conditions for the admissibility of public records." [Dkt. No. 243] ¶ 10. Sentinel correctly responds that "Exhibit 53 is an admissible FRE 1006 summary of otherwise admissible but voluminous records produced during discovery" and that none of VLM's objections make it inadmissible. [Dkt. No. 261] at 19. For example, it does not discuss subsequent remedial measures, it is not needlessly cumulative because it is a summary of what would otherwise be needlessly cumulative records, and VLM does not object to the admissibility of the underlying records that are summarized in Exhibit 53. For these reasons, the objection is without merit and has been overruled.

5.  Hold Harmless Agreements

The record in this action makes clear that it is common business practice in the frozen

fruit distribution industry for a buyer entering into a long-term, on-going business relationship

with a supplier to request and obtain a product guarantee agreement from the seller.  See [Dkt.

No. 214] Sentinel Ex. 1, (VLM Agreement); Ex. 9, Bernstein Dep. at 74:12-75:12, 76:3-22;

82:10-84:2; Ex. 10, Elias Dep. at 32:23-36:23; Ex. 8, Eberhard Dep. at 36:17-37:1, 37:7-23,

38:1-39:1.  For example, Patagonia requires all of its importers to provide Patagonia with

product guarantee agreements, [Dkt. No. 214] Sentinel Ex. 10, Elias Dep. at 32:23-36:23, and

VLM provides product guarantees to its customers whenever asked to do so, [Dkt. No. 214]

Sentinel Ex. 12, FeDuke Dep. at 17:23-19:13.

Patagonia had three agreements relevant to the issues in this civil action.  First, it had a

Hold Harmless Agreement and Guarantee/Warrantee of Product ("VLM-Patagonia agreement")

with VLM, which was signed by VLM at its headquarters in Canada and sent to Patagonia in

relation to Patagonia's purchase of pineapple from VLM's La Paz production facility in Costa

Rica.  [Dkt. No. 214] Sentinel Ex. 1; see Ex. 28 (Email from Ochoa (VLM) to Elias dated

11/10/2015); Ex. 29 (Certified Translation of Ex. 28); Ex. 9, Bernstein Dep. at 74:12-75:12; Ex.

8, Eberhard Dep. at 36:17-37:1, 37:7-23; Ex. 12, FeDuke Dep. at 31:8-32:25, 40:4-22; [Dkt. No.

215] VLM Ex. 3, Eberhard Dep. at 112:11-14.  The VLM-Patagonia agreement provided, in

relevant part:

The undersigned person or entity ("Seller") [VLM], for value received, hereby
represents and agrees as follows:

1. The articles contained in any shipment or delivery made by VLM Foods Inc.
[sic] made to or on the order of Patagonia Foods [sic] and its subsidiaries, affiliates,
or divisions (collectively referred to as "Buyer") is hereby guaranteed as of the date
of such shipment or delivery, (a) to not be adulterated or misbranded within the
meaning of the Federal Food, Drug and Cosmetic Act (the "Act") and (b) to not be

13

an article which cannot be introduced into interstate commerce under the provisions of Sections 404 and 505 of the Act.

2. Seller agrees to defend, indemnify and hold harmless Buyer and its employees, representatives, directors <u>and customers</u> (Individually an "Indemnitee") from all action [sic], suits, claims, demands and proceedings, ("Claims"), and any judgements [sic], damages, losses, debts, liabilities, penalties, fines, costs and expenses <u>(including reasonable attorney's fees)</u>, resulting therefrom whether arising out of contract, tort, strict liability, misrepresentation, violation of applicable law and/or any cause whatsoever:
. . .

> (iii) Brought or commenced by any person or entity against any Indemnitee for the recovery of damages for the injury, illness and/or death of any person, or loss or damage of property arising out of <u>or alleged to have arisen out of (a) the delivery, sale, resale, labeling, use or consumption of any Product</u> provided Seller [VLM] is aware and advised in writing of any such resale, labeling, use or consumption of such Product or (b) the negligent acts or omissions of Seller; provided, however, that seller's indemnification obligations hereunder shall not apply to the extent that Claims are caused by the negligence of Buyer.

. . .

> This guarantee and agreement is continuing and shall be in force and effect and shall be <u>binding upon Seller with respect to each and every Product shipped or delivered to Buyer</u> by Seller before the receipt of the Buyer of written notice of revocation thereof.

[Dkt. No. 214] Sentinel Ex. 1 (emphasis added except for the underlining of "Patagonia Foods,"

which was in the original).

The second agreement is a Hold Harmless Agreement and Guarantee/Warranty of

Product that Patagonia entered into with Sysco (the "Patagonia-Sysco agreement") in 2013.

[Dkt. No. 214] Sentinel Ex. 2.  Patagonia signed the agreement at its headquarters in California.

<u>Id.</u>  Similar to the VLM-Patagonia agreement, the Patagonia-Sysco agreement provided, in

relevant part:

> [Patagonia] agrees to defend, indemnify and hold harmless [Sysco] and Its employees, agents, representatives, directors and <u>customers</u> (Individually, an "Indemnitee") from all actions, suits, claims, demands and proceedings ("Claims"), and any judgments, damages, losses, debts, liabilities, penalties, fines, costs and expenses <u>(including reasonable attorneys' fees)</u> resulting therefrom, including but

not limited to enforcement of the terms of this Hold Harmless Agreement . . . whether arising out of contract, tort, strict liability, misrepresentation, violation of applicable law and/or any similar cause whatsoever:

. . .

(iii) brought or commenced by any person or entity against any Indemnitee for the recovery of damages, including but not limited to, the injury, illness and/or death of any person, or loss or damage of property, arising out of or <u>alleged to have arisen out of</u> (a) the delivery, sale, resale, labeling, use or consumption of any Product, or (b) the negligent acts or omissions of [Patagonia], provided, however, that [Patagonia's] indemnification obligations hereunder shall not apply to the extent that Claims are caused by the negligence of the Indemnitee seeking indemnification.   Notwithstanding the foregoing limitation on [Patagonia's] indemnification obligations, [Patagonia] shall defend each Indemnitee for all Claims until such time as a preponderance of the evidence exists that the Claims are caused by the negligence of such Indemnitee; provided, however, that [Patagonia's] defense obligations with respect to the remaining Indemnitees shall continue until terminated as provided in this sentence.

[Dkt. No. 214] Sentinel Ex. 2 (emphasis added).  Also, similar to the VLM-Patagonia

agreement, the Patagonia-Sysco agreement provided that it "is continuing and shall be in full

force and effect and shall be binding upon Seller with respect to each and every Product shipped

or delivered to or on the order of Buyer by the Seller before the receipt of the Buyer of written

notice of revocation thereof." <u>Id.</u> Sysco's distribution of the strawberries to TSC franchisees

was in turn "governed [by]" a "Master Distribution Agreement" between Sysco and TSC in

which TSC was identified as Sysco's "Primary Customer" and TSC franchisees were identified

as "Related Customer[s]." [Dkt. No. 214] Sentinel Ex. 3 (Sysco Distribution Agreement).

In addition, since 2008, Patagonia had worked with ITI under an agreement ("Patagonia-

ITI agreement") that stated, in part, that Patagonia agreed to:

[I]ndemnify and hold harmless ITI, its <u>customers</u> and those for whom ITI acts as agent in purchasing and defend them against all claims, liabilities, losses, damages and expenses, including attorney's fees, arising out of, in connection with, or in any way related to 1) the purchase, use or sale of any goods purchased from vendor [Patagonia], 2) the breach of any of the guarantees, or warranties, terms or conditions contained herein, . . . 4) any acts or omissions of [Patagonia], its employees, agents or representatives.  The Indemnity obligations set forth in the

15

immediately preceding sentence shall survive acceptance of the goods and payment therefore by ITI and any termination of this Vendor Agreement.

[Dkt. No. 214] Sentinel Ex. 4 at ¶ 12 (emphasis added).

6. Sentinel's Coverage Litigation

On November 7, 2016, shortly after the investigation into the HAV outbreak started, Sentinel filed a civil complaint against TSC in the United States District Court for the Northern District of Georgia seeking to rescind its insurance contract with TSC on the ground that TSC made material misrepresentations in its application for coverage. See Sentinel Insurance Co, Ltd. v. Tropical Smoothie Café, LLC, Case No. 1:16-cv-4162 (N.D. Ga.). Had that litigation been successful, Sentinel would not have had to cover TSC's attorney's fees or pay any settlements. Specifically, Sentinel alleged that TSC had misrepresented the identity of the insured, causing Sentinel to believe that the policy was for one of TSC's franchises, as opposed to itself as franchisor. Complaint at ¶¶ 12-15, Sentinel Insurance Co, Ltd. v. Tropical Smoothie Café, LLC, Case No. 1:16-cv-4162 (N.D. Ga.), Dkt. No. 1. That complaint also alleged that Sentinel cancelled the policy when, upon TSC's tender of the HAV actions, Sentinel observed that those actions had been brought against TSC as franchisor and not against the franchise which Sentinel believed it had insured. Id. at ¶ 16. On July 9, 2018, after substantial pre-trial discovery and litigation, that complaint was voluntarily dismissed without prejudice to enable Sentinel and TSC to resolve their dispute. Order at 6, Sentinel Insurance Co, Ltd. v. Tropical Smoothie Café, LLC, Case No. 1:16-cv-4162 (N.D. Ga. July 9, 2018), Dkt. No. 74.

## II. DISCUSSION[14]

### A. <u>Standard of Review</u>

In the Fourth Circuit, summary judgment is appropriate where "there is no genuine issue

as to any material fact and . . . the movant is entitled to judgment as a matter of law." <u>Norfolk S.</u>

<u>Ry. Co. v. City of Alexandria</u>, 608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56).  A

genuine dispute about a material fact exists if "after reviewing the record as a whole, a court

finds that a reasonable jury could return a verdict for the nonmoving party." <u>Dulaney v.</u>

<u>Packaging Corp. of Am.</u>, 673 F.3d 323, 330 (4th Cir. 2012).  All inferences must be made in

favor of the nonmoving party. <u>Hawkins v. McMillan</u>, 670 F. App'x 167, 168 (4th Cir. 2016).  In

addition, "[w]hen faced with cross-motions for summary judgment," as the Court is here, "the

court must review each motion separately on its own merits 'to determine whether [any] part[y]

deserves judgment as a matter of law.'" <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir.

2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

In breach of contract cases, summary judgment is appropriate "when the contract in

question is unambiguous or when an ambiguity can be definitively resolved by reference to

---

[14] The various agreements at issue in this case were executed in California and Quebec, Canada, and were performed in Virginia.  Accordingly, the parties dispute whether Canadian, Californian, or Virginian law applies, although they acknowledge that the law is similar in all of these jurisdictions except for California's approach to the parol evidence rule and Virginia's approach to the voluntary payment doctrine.  A choice of law analysis "becomes necessary . . . only if the relevant laws of the different [places] lead to different outcomes." <u>Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.</u>, 738 F.3d 95, 101 (4th Cir. 2013) (quoting <u>Lowry's Reports, Inc. v. Legg Mason, Inc.</u>, 271 F. Supp. 2d 737, 750 (D. Md. 2003)).  Therefore, "where the laws 'do not so conflict, the choice is immaterial, and the law of the forum . . . governs.'" <u>Id.</u> (quoting <u>Lowry's Reports, Inc.</u>, 271 F. Supp. 2d at 750; <u>see also</u> <u>Mulugeta v. Ademachew</u>, 407 F. Supp. 3d 569, 587 (E.D. Va. 2019) (collecting cases).  The Court will apply Virginia law to contract interpretation, except when addressing California's approach to the parol evidence rule, and will apply Virginia's approach to the voluntary payment doctrine, because Virginia law in all other respects is essentially the same as the California and Quebec law applicable to these contracts.

extrinsic evidence." SAS Institute, Inc. v. World Programming Ltd., 874 F.3d 370, 380 (4th Cir.

2017) (quoting Wash. Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc., 476 F.3d 231,

235 (4th Cir. 2007)).  Ambiguity exists when the contract language "objectively 'admits of being

understood in more than one way.'" Trex Co., Inc. v. ExxonMobil Oil Corp., 234 F. Supp. 2d

572, 575 (E.D. Va. 2002).

**B.  Analysis**

In moving for summary judgment on Count I, Sentinel argues that, having stepped into

the shoes of TSC, it is entitled to the same indemnification to which TSC was entitled under the

hold harmless agreements at issue.  Although the defendants, particularly VLM, raise multiple

arguments about the validity and applicability of the relevant agreements, the parties

acknowledge that this case largely turns on whether TSC qualifies as a "customer" under these

agreements.  As discussed in open court and explained more fully below, the agreements at issue

were valid and applied to the strawberries at issue, and TSC clearly qualified as a "customer"

under these agreements and its long-established business relationship with Patagonia.

1.  VLM's Liability to Sentinel

Under the VLM-Patagonia agreement, VLM guaranteed the quality of goods it sold to

Patagonia and agreed to indemnify Patagonia (the buyer) and "its employees, representatives,

directors and customers" from "all . . . claims . . . arising out of or alleged to have arisen out of

. . . the delivery . . . of any Product" on the condition that Patagonia had advised VLM in writing

of the intended use of the product VLM was supplying. (Emphasis added).

The Agreement does not define "customers."  Citing to Black's Law Dictionary, VLM

argues that a "customer" is only a "[a] buyer or purchaser of goods or services," Customer,

Black's Law Dictionary (11th ed. 2019), and because TSC never bought or purchased anything

and "never made payment to any party," it was not a customer.  [Dkt. No. 242] at 6.  Under that

18

definition, VLM argues that only the individual TSC franchisees could qualify as Patagonia's customers, because only they—not TSC—paid for the strawberries.  VLM further argues that TSC was nothing more than a broker, who arranged transactions "while standing entirely to the side of the actual transactions themselves," and therefore was not Patagonia's customer.  Id.

Sentinel responds by pointing to other definitions of "customer," including case law defining a "customer" as "one who has repeated business dealings with another."  [Dkt. No. 214] Br. at 25 (citing Am. States Ins. Co. v. Hartford Cas. Ins. Co., 950 F. Supp. 885, 887 (C.D. Ill. 1997) (quoting Black's Law Dictionary (6th ed. 1990))); see also id. (citing Am. States Ins. Co., 950 F. Supp. at 887 (quoting Webster's Third New International Dictionary (unabridged ed. 1986))); id. (citing Shorter Oxford English Dictionary (6th ed. Oxford Press 2007)).  Sentinel also points to the uncontested facts about TSC's long-term business relationship with Patagonia, which included negotiating and executing agreements with Patagonia under which its franchisees purchased roughly 100 million pounds of fruit from Patagonia over a 14-year period.  [Dkt. 214] Sentinel Ex. 9, Bernstein Dep. at 26:6-15.  Under these facts, no reasonable jury could find that TSC was not a customer of Patagonia under either party's proffered definition.

By trying to distinguish between franchisor and franchisee, VLM elevates form over function.  There is no genuine dispute that TSC created the very supply chain through which individual franchisees could order fruit.  In doing so, TSC was not acting on behalf of a principal, as a broker would, but was negotiating product prices, quantities, and specifications for its own benefit as well as for its franchisees.  Under these circumstances, TSC qualifies as Patagonia's "customer."

Clearly, TSC qualifies as Patagonia's "customer" even under VLM's preferred definition because a "purchaser" is not just one who pays money for goods or services.  The same edition

of Black's Law Dictionary cited by VLM defines "purchaser" as "[s]omeone who obtains property for money or other valuable consideration." Purchaser, Black's Law Dictionary (11th ed. 2019). TSC certainly gave Patagonia "valuable consideration" in the form of a lucrative commitment that its franchisees would purchase strawberries only from Patagonia (through Sysco).[15] [Dkt. No. 214] Sentinel Ex. 30 at Form Franchise Agreement, Background ¶ D and §§ 3.A, 6.A, 6.L. Furthermore, VLM cannot claim its interpretation is the most common one. To the contrary, in the Sysco Distribution Agreement, Sysco defines TSC as the "Primary Customer." Accordingly, the Court finds that the relevant indemnity provision in the Patagonia-VLM agreement is unambiguous and that TSC was Patagonia's "customer." See Trex Co., 234 F. Supp. 2d at 575 ("[T]he mere fact that the parties dispute the meaning of the language does not itself render the contract ambiguous.").

Even if the parties' dueling dictionary definitions render "customer" ambiguous, extrinsic evidence definitively resolves that ambiguity in favor of TSC.[16] Most important of those facts is Patagonia's response to Sentinel's First Set of Requests for Admission, in which Patagonia admitted that TSC was its "'customer' in connection with the Frozen Strawberries." [Dkt. No.

---

[15] That TSC did not receive strawberries is of no moment. Purchasers do not need to "obtain[]" property" themselves. For example, someone who buys a gift online and has it shipped directly to a friend would clearly be considered a purchaser of the item, even though the buyer never takes possession of the gift.

[16] The parties dispute whether the Court can look at extrinsic evidence in determining the meaning of "customer"; however, the Fourth Circuit, California, and Virginia all generally permit parol evidence to explain contractual ambiguity. See, e.g., World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992); Wolf v. Walt Disney Pictures & Television, 76 Cal. Rptr. 3d 585, 602 (Cal. Ct. App. 2008) (extrinsic evidence is admissible "to interpret an agreement when a material term is ambiguous"); Eure v. Norfolk Shipbuilding & Drydock Corp., Inc., 561 S.E.2d 663, 667–68 (Va. 2002) ("[W]hen a contract is ambiguous, the Court will look to parol evidence in order to determine the intent of the parties."). We do not need to address how the law of Canada approaches the issue, as no party argues it applies to the VLM-Patagonia agreement.

222] Sentinel Ex. 50 at RFA 8.  Although Patagonia now claims otherwise, its stance is

completely disingenuous.  The admission is "conclusive" pursuant to Fed. R. Civ. P. 36(b), and

Patagonia has not sought to withdraw it.  <u>Adventis, Inc. v. Consolidated Prop. Holdings, Inc.</u>,

124 F. App'x 169, 173 (4th Cir. 2005) (quoting <u>Langer v. Monarch Life Ins. Co.</u>, 966 F.2d 786,

803 (3d Cir. 1992)).  As a result, the admission conclusively settles the matter—Patagonia

considered TSC its "customer," and therefore VLM must indemnify TSC according to the terms

of the VLM-Patagonia agreement.[17]  With the interpretation of "customer" settled, defendants'

remaining arguments on this issue do not need to be addressed.

VLM turns to numerous alternative arguments to avoid liability.  For example, it argues

that even if TSC were a customer, the condition precedent to invoking the indemnification clause

was not met, because VLM was not "aware and advised in writing of any such resale, labeling,

use or consumption of such Product" as required by the agreement; however, Patagonia's form

purchase orders satisfied the notification required by including the statement: "Please note that

this product to be sold through distribution to a foodservice chain accounts [sic]."  Although this

was the only notification that Patagonia gave to VLM regarding the "resale . . . use or

consumption" of the strawberries, this statement clearly put VLM on notice that the fruit was

being sold to foodservice chains such as TSC franchisees, and nothing in the VLM-Patagonia

agreement required that Patagonia provide more detailed information about to whom it was

selling the product.

---

[17] Although not dispositive of the issue, it is worth noting that Patagonia's own officers—
including its president and founder, vice president, and director of quality control—have referred
to TSC as Patagonia's "customer."  [Dkt. No. 214] Sentinel Ex. 9, Bernstein Dep. at 64:22-65:2;
Ex. 32 (email dated 8/24/2016); Ex. 8, Eberhard Dep. at 32:11-35:10; Ex. 10, Elias Dep. at 30:1-
10.  These statements are relevant to determining that TSC was Patagonia's "customer,"
particularly in the absence of any evidence indicating that Patagonia thought differently when it
entered into the VLM Agreement.

VLM also argues that the hold harmless provision in Section 2 must be read in context with the guarantee provision in Section 1, and that, read together, those two provisions mean that VLM must only indemnify Patagonia when VLM has sold Patagonia a product that is adulterated, misbranded, or cannot be introduced into interstate commerce as of the date of shipment or delivery. This argument also fails because it overlooks the clear structure of the agreement. Section 1 is a guarantee provision, and the separately numbered Section 2 is an entirely unrelated indemnification and hold harmless provision. Because they are numbered separately, the reasonable interpretation is to read these provisions as independent provisions.

Next, VLM argues that Sentinel has not proven, and cannot prove, that VLM breached the hold harmless provision because it is impossible to trace which strawberries were actually used at any given TSC franchise location, and because Patagonia sourced frozen strawberries from other producers, including other Egyptian producers. Sentinel responds that it is not required to prove that the strawberries obtained from VLM and ICAPP led to the outbreak, as the hold harmless provision covers any claim "<u>alleged</u> to have arisen out of (a) the delivery, sale, resale, labeling, use or consumption of any Product," which clearly covers the allegations brought by claimants alleging that strawberries VLM sourced from ICAPP caused the HAV outbreak. <u>See</u> [Dkt. No. 214] Sentinel Ex. 1 ¶ 2. Sentinel has the better argument, as the HAV claims brought against TSC "alleged" that the contaminated strawberries were the Egyptian frozen strawberries shipped from ICAPP and VLM.

VLM further argues that the VLM-Patagonia agreement is invalid because it lacks mutuality. Although the VLM-Patagonia agreement is signed only by VLM and is undated, Patagonia responds that the agreement only needed to be signed by the party against whom enforcement is sought—here, VLM—and highlights that VLM, the drafter of the agreement, did

not include a line or space for a signature signifying Patagonia's acceptance.  Moreover, the agreement was sent to Patagonia by VLM with no statement or indication that Patagonia needed to do anything but accept it for it to become effective.

Relying on a provision in the VLM-Patagonia agreement that requires Patagonia to indemnify VLM in certain circumstances, VLM argues that the VLM-Patagonia agreement needed to be signed by both VLM and Patagonia because it imposed indemnification duties upon both VLM and Patagonia.[18]  Despite this clause, there is no indication that the parties intended the hold harmless agreement to be ineffective unless signed by both parties, as the agreement, which was drafted and signed by VLM, lacks a signature line for Patagonia.  Moreover, there is no evidence in the record that VLM asked Patagonia to sign the agreement.  Rather, the VLM-Patagonia agreement begins and ends with language indicating that only VLM's signature was anticipated.  For example, the first sentence of the VLM-Patagonia agreement states: "The

---

[18] Specifically, the provision included that:

> Buyer shall defend, indemnify and hold Seller harmless against any and all claims, damages, expenses, reasonable attorneys' fees, settlement costs and judgements arising out of any personal injury, bodily injury or property damage to a third party alleged to have been caused by the Products, except to the extent that such injury or damage was the result of Products not meeting [sic] being manufactured to meet Specifications, or the result of any latent defects in the Products caused by the negligence or willful misconduct of Seller. . . . Seller shall promptly notify Buyer of any such claims or actions, shall reasonably cooperate with Buyer in the defense of such claim or action, and shall permit Buyer to control defense and settlement of such claim or action, all at Buyer's cost and expense....

[Dkt. No. 214] Sentinel Ex. 1.

VLM does not appear to be arguing in its motion for summary judgment that Patagonia need indemnify it against Sentinel's claims, even though that was VLM's argument in its crossclaim against Patagonia.  [Dkt. No. 89].  VLM has not filed any dispositive motions regarding that crossclaim and does not make this argument in any of its briefs pending before the Court.  This is likely because VLM would have to admit the legitimacy of the VLM-Patagonia agreement, and VLM has instead decided to contest the legitimacy of the VLM-Patagonia agreement.

undersigned person or entity ('Seller') [VLM], for value received, hereby represents and agrees as follows . . . ." [Dkt. No. 214] Sentinel Ex. 1.  Similarly, the last sentence of the VLM-Patagonia agreement states: "This guarantee and agreement is continuing and shall be in force and effect and shall be binding upon Seller [VLM] . . . ." Id.  It does not reflect that it is binding on the buyer—Patagonia.  There is also only one typed signature line, which is for a representative of VLM.  Id.  Given these uncontroverted facts, the Court finds that the purpose of the agreement was to bind VLM and provide a guarantee and hold harmless agreement to Patagonia and its customers.  Accordingly, the VLM-Patagonia agreement is valid, and under it, VLM is liable to Patagonia and Patagonia's customers, which for the reasons previously discussed include TSC.

VLM tries to limit the scope of the agreement by arguing that it was solely an agreement in which Patagonia agreed to purchase pineapples from VLM's La Paz production facility in Costa Rica. [Dkt. No. 215] VLM Ex. 3, Eberhard Dep. at 112:11-14; Ex. 30, Preston Dep. at 50:5-13, 68:14-22.  The VLM-Patagonia agreement was on VLM letterhead, which includes the logos of La Paz as well as other VLM affiliates; it otherwise makes no mention of La Paz.  [Dkt. No. 214] Sentinel Ex. 1.  Instead, without any limitation, the agreement covers "[t]he articles contained in any shipment or delivery made by VLM Foods Inc. made to or on the order of Patagonia Foods and its subsidiaries, affiliates or divisions (collectively referred to as 'Buyer')." Id. (emphasis in original).  Additionally, the agreement specifies that "[t]his guarantee and agreement is continuing and shall be in force and effect and shall be binding upon Seller with respect to each and every Product shipped or delivered to Buyer by Seller before the receipt of the Buyer of written notice of revocation thereof." Id.  It is signed by Mark FeDuke, VLM's director of operations at that time, and lists "VLM FOODS INC.," VLM's address block, and

FeDuke's contact information below his signature. Id. Nothing in the agreement appears to limit its application to one order of pineapples or only shipments from La Paz; rather, the agreement expressly applies to "any shipment or delivery" and "each and every Product shipped or delivered to [Patagonia] by [VLM]." Id. Moreover, there is no evidence in the record of any written notice of revocation of this agreement before the time period relevant to this litigation. Accordingly, the VLM-Patagonia agreement applies to the frozen strawberries shipped to Patagonia by VLM, and under that agreement VLM is required to indemnify TSC, which the Court finds is a customer of Patagonia.

2.  Patagonia's Liability to Sentinel

Patagonia's liability to Sentinel is governed by the Patagonia-Sysco and Patagonia-ITI agreements. Using essentially the same language as the VLM Agreement, the Patagonia-Sysco agreement contains a promise by Patagonia to indemnify and defend Sysco and its "customers" from claims and suits "alleged to have arisen out of (a) the delivery, sale, resale, labeling, use or consumption of any Product," and like the VLM Agreement, this one is also signed only by the party against whom the hold harmless obligations are to be enforced, in this case, Patagonia. That TSC is a customer for purposes of this agreement is even clearer because a separate agreement between Sysco and TSC, the Sysco Distribution Agreement, explicitly states that TSC is the "Primary Customer" and the franchisees are "Related Customer[s]." Under the Sysco-TSC agreement, TSC is required to direct its franchisees to purchase a significant amount of product from Sysco in each year of the agreement's multi-year term,[19] and TSC is responsible for paying Sysco for unpurchased products—including frozen strawberries—that Sysco purchased for distribution to TSC's franchises. [Dkt. No. 214] Sentinel Ex. 3; Sentinel Ex. 11, Davis-Smith

---

[19] The actual amount is under seal. [Dkt. No. 193] Sentinel Ex. 3 at Schedule 3.

Dep. at 76:19-77:11.[20]  Given that TSC is clearly a "customer" of Sysco, TSC is entitled to indemnification per the Patagonia-Sysco agreement, under which Patagonia agreed to indemnify Sysco's customers.

Patagonia further argues that even if TSC were a "customer" of Sysco, the Patagonia-Sysco Agreement does not apply to the strawberries at issue because they were not "shipped or delivered to or on the order of [Sysco]." The Patagonia-Sysco agreement provided that it is binding upon Patagonia "with respect to each and every Product shipped or delivered to or on the order of Buyer [Sysco] by the Seller [Patagonia]." [Dkt. No. 214] Sentinel Ex. 2 at ¶ 5. In 2015, TSC placed ITI into the distribution chain between Patagonia and Sysco to perform redistribution services. Under that agreement, ITI ordered and purchased product on behalf of TSC, including the strawberries at issue, from Patagonia and arranged for their shipment and delivery to various Sysco locations. Sentinel argues that the introduction of ITI into the supply chain did not disrupt the relationship between Sysco (the distributor who directly supplied the franchises) and Patagonia (the vendor who sourced the strawberries according to TSC's specifications). Additionally, Sentinel argues that the frozen strawberries at issue were "shipped or delivered" directly from Patagonia to Sysco because the two Sysco operating companies that

---

[20] Specifically, Davis-Smith testified that TSC would owe payment to Sysco:

> if there's a customer-directed product that they ask us to bring into stock for a short term or long term or whatever, and their franchisees don't buy that product and it quits moving and it sits in their inventory and they—the franchisor would be required to be responsible and pay for those products that they directed us bring into those operating companies.

> Q: Would Patagonia-branded strawberries be such a customer-directed product?

> A: Yes, sir.

[Dkt. No. 214] Sentinel Ex. 11, Davis-Smith Dep. at 76:19-77:11.

supplied TSC's franchises in Virginia were excluded from the supply chain change. [Dkt. No.

214] Sentinel Ex. 25 (email announcing the supply chain change but stating that "Virginia and

Hampton Roads will order from ITI but will be shipped direct"). Accordingly, there is

unrebutted evidence in the record that the strawberries at issue were shipped or delivered to or on

the order of Sysco, even after TSC inserted ITI into the distribution chain, to find that this

requirement is met.

　　　　Similarly, TSC was a customer of ITI, which had a similar agreement with Patagonia.

Under the Supply Chain Solutions Services Agreement between TSC and ITI, TSC "retain[ed]

ITI to provide supply chain logistics and redistribution services." [Dkt. No. 214] Sentinel Ex. 5.

Those services were designed to reduce freighting costs and improve the efficiency of TSC's

supply chain. TSC directed Sysco to purchase frozen fruit for TSC franchises from ITI. [Dkt.

No. 214] Sentinel Ex. 25 (Sysco's corporate office directing Sysco distribution companies to

purchase TSC fruit from ITI); [Dkt. No. 214] Sentinel Ex.11, Davis-Smith Dep. at 103:5-8

(Sysco paid ITI for the frozen fruit). The Supply Chain Solutions Services Agreement states that

TSC is "committed to helping ensure that their Distributors will provide the cooperation

necessary for a successful implementation and on-going [redistribution] program [with ITI]" by

enforcing "minimum Distributor order quantities" and preventing distributors' potential

"circumvention of the [ITI] Redistribution program." [Dkt. No. 214] Sentinel Ex. 5 at ¶ 5.

Accordingly, TSC was a "customer" of ITI, and is therefore also entitled to indemnification from

Patagonia under both the Patagonia-Sysco and Patagonia-ITI agreements, in each of which

Patagonia agreed to indemnify Sysco's and ITI's customers.

　　　　3.　Whether Sentinel Can Recover Under the Voluntary Payment Doctrine

　　　　Even if TSC is entitled to be reimbursed under the indemnification agreements, VLM and

Patagonia argue that the voluntary payment doctrine bars any recovery for Sentinel on behalf of

TSC. "The voluntary payment doctrine, as established under Virginia common law," provides

that:

> Where a party pays an illegal demand with full knowledge of all the facts which
> render such demand illegal, (i) without an immediate and urgent necessity therefor,
> or (ii) unless to release his person or property from detention, or (iii) to prevent an
> immediate seizure of his person or property, such payment must be deemed
> voluntary, and cannot be recovered back.  And the fact that the party at the time of
> making the payment, files a written protest, does not make payment involuntary.

D.R. Horton, Inc. v. Bd. of Supervisors for Cty. of Warren, 737 S.E.2d 886, 888 (Va. 2013); see

also Cappetta v. CG Servs. Ltd. P'ship, 654 F. Supp. 2d 453, 463–64 (E.D. Va. 2009).[21]

Defendants support this argument by citing to Sentinel's litigation in Georgia for rescission of

the insurance policy and recoupment against TSC.  Defendants claim that this litigation shows

that Sentinel "had full knowledge of the facts that it could have rescinded its policy and obtained

recoupment from TSC," but instead of doing that, it "voluntarily dismissed" its rescission action,

thereby rendering the attorney's fees and expenses and damages it paid on TSC's behalf "a

voluntary payment." [Dkt. No. 211] at 28.  Sentinel rebuts that argument by pointing to the

explanation of Douglas Shapiro, assistant vice president in the major case unit at Hartford, that

as Sentinel's rescission action progressed, Sentinel discovered information that "caused

[Sentinel] to rethink the strength of [its] rescission action." [Dkt. No. 240] Sentinel Ex. 4,

Shapiro Dep. at 56:9-22, 66:5-8.  Specifically, Sentinel discovered: (1) that it "had insured [TSC]

---

[21] California has a somewhat more lenient voluntary payment doctrine as applied to insurers: if
an insurer makes a "good-faith payment under a reasonable belief that the payment is necessary
to protect its own interests," it "is entitled to indemnity or subrogation even if it subsequently
develops that he had no interest to protect." Continental Ins. Co. v. Fidelity and Deposit Co. of
Maryland, No. 89-55161, 1990 WL 127566 at *2 (9th Cir. Sept. 4, 1990) (citing Aetna Life &
Cas. Co. v. Ford Motor Co., 122 Cal. Rptr. 852, 854 (Cal. Ct. App. 1975))).  Under either
Virginia or California law, Sentinel clearly provided TSC with a defense to the HAV litigation
and paid some claims arising out of it because it was compelled to under the terms of the policy
it issued to TSC.  Therefore, the payment does not qualify as voluntary under either jurisdiction's
law.

with a Workers' Comp [sic] policy and that prior to the issuance of this insurance, the Workers'

Comp group had done an audit and were aware that [TSC] was in fact a national franchisor," and

(2) that the underwriter who issued the Policy in 2014 "had previously rejected the application

due to the fact that [TSC] was a franchisor." Id. at 56:9–22.  Based on that information, Sentinel

dismissed its complaint.

The defendants' effort to rely solely on the allegations made in Sentinel's withdrawn

complaint is not sufficient to support their voluntary payment argument, as the complaint was

drafted before Sentinel discovered the information that led to the plaintiff's voluntary dismissal

of the complaint.  Accordingly, the Court finds that Sentinel was obligated under the insurance

policy to defend TSC against the HAV claims, and the voluntary payment doctrine does not bar

Sentinel's recovery in this litigation.

4.  Sentinel's Expenses and Fees

It is undisputed that Sentinel incurred $3,530,626.23 in legal fees and costs to defend

TSC against the HAV claims and paid an additional $17,666.67 to settle some HAV claims, for a

total expenditure of $3,548,292.90.  [Dkt. No. 269].  In its cross-motion for summary judgment

as to Sentinel's complaint, VLM initially objected to this amount, asserting that Sentinel did not

review the bills submitted by the underlying defense firm for reasonableness.  [Dkt. No. 243] at

¶ 77 (citing VLM Ex. 61, Shapiro Dep. at 82:16-85:6, 90:1-92:8).  In his deposition, Shapiro

testified that Sentinel did not review the bills for reasonableness because they were submitted by

independent counsel for TSC, id.; however, Barry Trebach, Sentinel's expert for this litigation,

reviewed the fees and opined that they were reasonable.  [Dkt. No. 214] Sentinel Ex. 17, Trebach

Dep. at 40:15-20.

VLM further asserted that Sentinel paid "additional monies" for work that "was not

related to the defense of the underlying" HAV claims, but Sentinel asserts that those additional

fees were excluded from the $3,548,292.90 that Trebach opined was fair, necessary, and reasonable. Finally, VLM protested that Trebach did not review "all of the underlying case files" or the "entire case files of Weinberg Wheeler regarding the underlying claims." [Dkt. No. 243] at ¶¶ 77-78. Although Trebach did not review every single piece of paper, he reviewed sufficient records to be able to opine on the reasonableness of the fees. VLM not only did not designate a counter expert on this issue, but during oral argument it conceded that the fees were reasonable. [Dkt. No. 268] Hearing Tr. at 11:22-12:7. For these reasons, the Court finds that the damages sought by Sentinel are uncontested and reasonable.

Sentinel also requests that the Court enter an order scheduling an evidentiary hearing to establish the amount of costs and expenses, including attorney's fees, Sentinel incurred in this litigation to enforce the terms of the Patagonia agreements. Specifically, in Section 2 of the Patagonia-Sysco agreement, Patagonia agreed to:

> defend, indemnify and hold harmless [Sysco] . . . and its . . . customers (Individually, an "Indemnitee") from all actions, suits, claims, demands, and proceedings ("Claims") and any judgments, damages, losses, debts, liabilities, penalties, fines, costs and expenses (including reasonable attorneys' fees) resulting therefrom, including but not limited to enforcement of the terms of this Hold Harmless Agreement . . . whether arising out of contract, tort, strict liability, misrepresentation, violation of applicable law, and/or any similar cause whatsoever....

[Dkt. No. 214] Ex. 2 (emphasis added). Similarly, in the ITI Agreement, Patagonia agreed to:

> indemnify and hold harmless ITI, its customers and those for whom ITI acts as agent in purchasing and defend them against all claims, liabilities, losses, damages and expenses, including attorney's fees, arising out of, in connection with, or in any way related to . . . 2) the breach of any of the guarantees, or warranties, terms or conditions contained herein. . . .

[Dkt. No. 214] Ex. 4 at ¶ 12 (emphasis added). Because the Court has found that TSC qualifies as a customer under these two valid agreements, the Court will award Sentinel the reasonable

attorney's fees and costs it incurred in enforcing these hold harmless provisions against Patagonia after setting a briefing schedule.

### 5. Sentinel's Count II Claim for Subrogation

Count II of Sentinel's third amended complaint is for "Subrogation," which alleges that Sentinel is entitled to be placed in the position of TSC and recover from defendants the costs of defending and indemnifying TSC against the HAV claims, which in equity should have been the responsibility of defendants.  Sentinel has not moved for summary judgment on this count, and VLM and Patagonia argue that this count should be dismissed.  During oral argument, plaintiff's counsel acknowledged that if the Court granted plaintiff's recovery under Count I, Count II may be dismissed.  [Dkt. No. 268] Hearing Tr. at 17:16-23.  Accordingly, the Court need not address the arguments as to Count II, which will be dismissed.

### 6. Liability Between Patagonia and VLM

Given the foregoing analysis, Patagonia and VLM are jointly and severally liable to Sentinel, standing in place of TSC, for the costs and fees it has incurred in the HAV litigation and in this litigation.  Moreover, under the VLM-Patagonia agreement, VLM must indemnify Patagonia for Patagonia's liability to Sentinel, as well as its litigation costs.  As stated in Section II.B.1, supra, the VLM-Patagonia agreement is valid and enforceable, it applies to the frozen strawberries shipped to Patagonia by VLM, and the plain text of the hold harmless provision requires VLM to indemnify and hold harmless Patagonia under the circumstances here, where the underlying injury claims were "alleged to have arisen out of . . . the delivery, sale, resale, labeling, use or consumption of any Product," and VLM was made "aware and advised in writing of any such resale, labeling, use or consumption of such products."  For these reasons, Patagonia prevails on its crossclaim against VLM for indemnification of any damages it has

incurred in connection with the litigation concerning the HAV lawsuits, as well as its attorney's fees and costs incurred in this litigation, if those fees and costs are sought.

## III. CONCLUSION

For the reasons stated in open court and in this Memorandum Opinion, Sentinel's summary judgment motion against Patagonia and VLM [Dkt. No. 209] has been GRANTED, and Patagonia's and VLM's cross-motions for summary judgment against Sentinel [Dkt. No. 200 and 210, respectively] DENIED. As a result, VLM and Patagonia are jointly and severally liable to Sentinel in the amount of $3,548,292.90, plus pre-judgment interest. This leaves as the only unresolved issue between these parties the attorney's fees and costs which Sentinel incurred in this litigation. In addition, because Sentinel is entitled to a full recovery under Count I of its Third Amended Complaint, Count II will be DISMISSED, as will all claims against VLM Foods USA, Inc. and ICAPP.

Moreover, Patagonia's summary judgment motion against VLM [Dkt. No. 203] has been GRANTED, and VLM's cross-motion for summary judgment on Patagonia's crossclaim [Dkt. No. 212] has been DENIED. As a result, VLM must indemnify Patagonia for Patagonia's liability to Sentinel, and if Patagonia seeks reimbursement for its attorney's fees and costs incurred in this litigation, VLM will be liable for those fees and costs to the extent they are found to be reasonable.

A motion reflecting these decisions and setting schedules for briefing the unresolved claims for attorney's fees and costs will be issued with this Memorandum Opinion.

Entered this 1ST day of October, 2021.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge