IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SENTINEL INSURANCE COMPANY, LTD.,      )
                                        )
        Plaintiff,                       )
                                        )
     v.                                   )    1:19-cv-1395 (LMB/WEF)
                                        )
VLM FOODS, INC., et al.,                 )
                                        )
        Defendants.                       )

MEMORANDUM OPINION

Before the Court are plaintiff Sentinel Insurance Company, Ltd.'s ("Sentinel")[1] Motion

for Attorneys' Fees and Expenses and Prejudgment Interest Calculation [Dkt. No. 293] and

defendant Patagonia Foods, LLC's ("Patagonia") Motion for an Award of Attorney's Fees and

Litigation Costs [Dkt. No. 295]. For the following reasons, both motions will be granted in part

and denied in part.

I. BACKGROUND

This action arises out of a 2016 outbreak of hepatitis A virus ("HAV") linked to

consumption of frozen strawberries used as ingredients, and then served to customers, by various

Tropical Smoothie Café, LLC ("TSC") franchises.[2] [Dkt. No. 311] at 2. The contaminated

strawberries were alleged to have been imported from Egypt by defendant VLM Foods, Inc.

("VLM"), a global frozen food vendor based in Quebec, Canada. Id. at 2; [Dkt. No. 214] at ¶53.

VLM sold the strawberries to Patagonia, a wholesale seller of frozen produce based in

California, who then relied on two companies, Sysco Corporation ("Sysco") and International

---

[1] Sentinel also refers to itself as "Hartford" in its memoranda.

[2] For a more comprehensive background, see the memorandum opinions dated October 1, 2021
[Dkt. No. 276] and May 19, 2022 [Dkt. No. 311].

Traders, Inc. ("ITI"), to deliver the frozen strawberries to TSC franchises. [Dkt. No. 276] at 5-10. These companies entered into three relevant indemnity and product guarantee agreements. First, VLM provided Patagonia with a Hold Harmless Agreement and Guarantee/Warranty of Product that VLM drafted and signed at its headquarters in Quebec and sent to Patagonia in California ("VLM-Patagonia Agreement"). Id. at 13-14. Second, Patagonia entered into a Hold Harmless Agreement and Guarantee/Warranty of Product with Sysco ("Patagonia-Sysco Agreement"). Id. at 14-15. Third, Patagonia entered into a similar, but untitled, agreement with ITI ("Patagonia-ITI Agreement"). Id. at 15-16.

In the fall of 2016, over 200 claims were asserted against TSC and various TSC franchises to recover damages for bodily injuries sustained from consuming the contaminated strawberries ("HAV claims"). Id. at 11. Although TSC tendered the HAV claims to Patagonia on October 18, 2016 and to VLM on January 24, 2017 and asked for defense and indemnity under the three aforementioned agreements, Patagonia and VLM refused. [Dkt. No. 214-39, 214-41]. As a result, TSC's insurance company, Sentinel, ultimately incurred $3,548,292.90 in attorneys' fees and litigation expenses to defend TSC against the HAV claims and to settle three of the claims. [Dkt. No. 276] at 4-5.

On November 1, 2019, Sentinel initiated this civil action to recover that amount plus interest from Patagonia and VLM under the various hold harmless agreements. Id. at 3. In two memorandum opinions, dated October 1, 2021 and May 19, 2022, the Court resolved a total of seven summary judgment motions and held that VLM and Patagonia were jointly and severally liable to Sentinel for the $3,548,292.90 that it incurred to defend TSC against the HAV claims, plus prejudgment interest on that amount and the "reasonable attorney's fees and costs Sentinel incurred in pursuing this litigation." Id. at 32; [Dkt. No. 277] at 1. The Court also found that

VLM was contractually obligated to indemnify Patagonia for Patagonia's liability to Sentinel. [Dkt. No. 277] at 1; [Dkt. No. 311] at 8.  Those opinions left the issues of the fees and costs that Sentinel and Patagonia incurred in this action and the calculation of prejudgment interest for further briefing.  These issues are now before the Court and are ripe for review.

## II. SENTINEL'S MOTION

Sentinel argues that it is entitled to prejudgment interest at an annual rate of 10% on the $3,548,292.90 judgment, in addition to $1,243,564.00 in attorneys' fees and $326,568.28 in costs that it incurred to pursue this action.  [Dkt. No. 293-1].  In response, VLM argues that Sentinel is not entitled to any prejudgment interest and should be awarded no more than $227,832.35 in attorneys' fees and costs for pursuing this action, which is roughly 85% less than Sentinel is requesting.  [Dkt. No. 303].  Patagonia does not respond to Sentinel directly, but rather adopts VLM's arguments against Sentinel.  [Dkt. No. 302].

### A. **Prejudgment Interest**

The prejudgment interest laws of California and Virginia conflict, making it necessary to determine which state's law applies before considering the availability, amount, and start date of any prejudgment interest.  See Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 101 (4th Cir. 2013) ("[C]hoice of law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes.") (quoting Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 750 (D. Md. 2003)).  Under California law, the interest rate would be 10% per year, and prejudgment interest is mandatory in some circumstances.  Cal Civ. Code § 3287 & § 3289(b).  Under Virginia law, prejudgment interest is always discretionary and the rate is 6% per year.  See Va. Code § 8.01-382 and § 6.2-302.B.  Sentinel argues that California law applies to the prejudgment interest issues, because this is a breach of contract case and

3

California law governs the relevant contracts.  VLM argues that Virginia law applies because a federal court sitting in diversity must apply "state law" to calculate prejudgment interest.

VLM is correct that state—rather than federal—law applies; however, VLM identifies the wrong state as the source of controlling law.  It is well established that a federal court sitting in diversity applies the substantive law of the forum state—including its conflict of laws rules. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941) (holding that lower courts erred in not considering conflict of laws rules of the forum state when considering availability of prejudgment interest in a diversity case).  VLM overlooks Virginia's conflict of laws rules when it argues that Virginia's prejudgment interest rate applies here.  This flaw in VLM's argument is evident from the cases it claims support its argument.

VLM cites several cases in which courts in this district applied Virginia law to determine prejudgment interest; however, those cases all involved contracts governed by Virginia law (making them consistent with Sentinel's position that the law governing the underlying contracts also governs prejudgment interest).  For example, VLM cites SunTrust Mortgage, Inc. v. United Guaranty Residential Insurance Co. of North Carolina, 809 F. Supp. 2d 485 (E.D. Va. 2011), for the proposition that "Virginia law applies to the issue of prejudgment interest in this diversity case," [Dkt. No. 303] at 2, without acknowledging that Virginia law governed the underlying contracts in that case. Id. at 492.  Similarly, VLM cites Continental Insurance Co. v. City of Virginia Beach, 908 F. Supp. 341 (E.D. Va. 1995), in which the court applied Virginia law to the underlying contract claim before stating that "state law controls a party's entitlement to prejudgment interest"[3] in a diversity case and applying Virginia law to that question as well. Id.

---

[3] Notably, the Continental Insurance opinion simply states that "state law" applies; it does not stand for the proposition that the forum state's law must be followed to determine all questions of prejudgment interest.  908 F. Supp. at 349.

at 349 (citing United States v. Dollar Rent A Car Systems, Inc., 712 F.2d 938, 940 (4th Cir.1983)).[4] The remainder of the cases cited on pages two and three of VLM's brief are similarly unhelpful to defendants' position, and some even support plaintiff's argument that California law applies. E.g., E. Profit Corp. Ltd. v. Strategic Vision US LLC, No. 18-cv-2185, 2021 WL 2935972, at *1 (S.D.N.Y. July 12, 2021) (applying non-forum law, rather than forum law, and stating "[b]ecause this is a diversity case, Virginia law governs the award of prejudgment interest"). In short, VLM offers no authority to support its assertion that Virginia law applies to Sentinel's claim for prejudgment interest solely because Virginia is the forum state for this diversity action.

In contrast to defendants, Sentinel provides ample support for its position that the law governing a breach of contract claim also governs the award of prejudgment interest on the damages resulting from that breach. This conclusion is squarely supported by Thornhill v. Donnkenny, Inc., 823 F.2d 782 (4th Cir. 1987), in which the Fourth Circuit stated that "if New York substantive law governs the breach of contract claim by virtue of Virginia's conflicts of law rules, we believe that Virginia would follow New York substantive law on the issue of prejudgment interest as well." Id. at 787; see also Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 311 (4th Cir. 2020) (holding that Maryland law applied to prejudgment interest issue decided by Virginia federal court because the underlying contract included Maryland as the governing law). This rule is also supported by recent case law from this district. See Wichard v. Suggs, No. 1:15-cv-1722, 2016 WL 1322549, at *5 (E.D. Va. Apr. 5, 2016) (applying California

---

[4] Continental Insurance's reliance on Dollar Rent A Car Systems, Inc. is misplaced because Dollar Rent A Car involves a federal government contract performed in a federal enclave and is not a diversity case. 712 F.3d at 941.

law of prejudgment interest because "the underlying contract at issue . . . is 'construed, interpreted and enforced according to the laws of the State of California'").

The judgment here involves three contracts. VLM's liability to Sentinel stemmed from the VLM-Patagonia Agreement, and Patagonia's liability to Sentinel arose from the Patagonia-Sysco and Patagonia-ITI Agreements. At the summary judgment stage, the parties disputed whether these agreements were governed by the law of California, Quebec, or Virginia. The contracts did not include choice of law clauses and the litigation arose from contacts in all three locations: VLM was a Canadian company, Patagonia was a Californian company, VLM delivered the strawberries to Patagonia in Virginia, and a majority of the HAV claims were filed in Virginia. [Dkt. No. 215] at ¶¶39-40.[5] Sentinel argued the VLM-Patagonia agreement was governed by the law of Quebec; that there was no conflict between the law of Quebec and the law of California with regard to the dispositive issues before the Court; that where a conflict existed between the law of Virginia and the law of Quebec/California, the Court should apply the law of Quebec/California; and that where no conflict existed, the forum state's law should apply. [Dkt. No. 214] at 22 n.7; [Dkt. No. 238] at 6-7.

In the October 1, 2021 Memorandum Opinion, the Court did not hold that Virginia law applied. Instead, it held that there was no material conflict among the three jurisdictions' principles of contract interpretation, other than with regard to the parol evidence rule. [Dkt. No. 276] at 17 n.14. As to that conflict, the Court applied California law to decide the issues

---

[5] Both Sentinel and Patagonia have asserted that California law applies to the Patagonia-Sysco and Patagonia-IHI contracts. In its motion for summary judgment against Sentinel, Patagonia asserted that "California Law Applies" to those contracts [Dkt. No. 201] at 6-8, and Sentinel agreed with that position because Patagonia executed the contracts in California. [Dkt. No. 214] at 26 n.10.

concerning the parol evidence rule and, because there was no other conflict of laws, used forum law for all other matters of contract interpretation.  Id.

Because the Court applied California law where there was a conflict of laws, Sentinel asserts that "this Court determined that California law applies."  [Dkt. No. 294] at 11 (citing [Dkt. No. 276] at 17 n. 14).  VLM does not address this argument, and the Court agrees with Sentinel's position that the law of the case is that the Court will apply California law where there is a conflict of laws.

In California, prejudgment interest in breach of contract cases is governed by Section 3287 of the California Civil Code.  "It has long been settled that section 3287 should be broadly interpreted to provide just compensation to the injured party for loss of use of money during the prejudgment period."  Gourley v. State Farm Mut. Auto. Ins. Co., 822 P.2d 374, 381(1991), as modified on denial of reh'g (May 23, 1991) (citations omitted) (Broussard, J., dissenting)(describing history and purpose of prejudgment interest in California).  This is because "denying recovery of prejudgment interest is to require the plaintiff to make an interest-free loan to the defendant from the time of loss until judgment" during which time the defendant "obtains the benefit of investing the money."  Id. at 383.

Under Section 3287(a), prejudgment interest is mandatory when "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover . . . is vested in the person upon a particular day" and the interest must be calculated "from that day."  Cal. Civ. Code § 3287(a).  Subsection (a) applies when the defendant "actually knows the amount owed or could have computed the amount from reasonably available information." Cataphora Inc. v. Parker, 848 F. Supp. 2d 1064, 1072 (N.D. Cal. 2012) (citing Children's Hosp. & Med. Ctr. v. Bonta,  118 Cal.Rptr.2d 629, 654 (2002)).

7

Pursuant to subsection (b), prejudgment interest is discretionary where the "judgment to receive damages [is] based upon a cause of action in contract where the claim was unliquidated," and the date upon which the action was filed is the earliest date upon which interest can begin. Subsection (b) applies "if the amount of damages depends on disputed facts or the available factual information is insufficient to determine the amount." Collins v. City of Los Angeles, 139 Cal. Rptr. 3d 880, 889 (Cal. Ct. App. 2012). The Court finds that § 3287(b) applies here.

On October 1, 2021, the Court awarded Sentinel $3,548,292.90 in damages, which consists of $3,342,989.41 in attorneys' fees incurred to defend against the underlying HAV claims, $187,636.82 in associated litigation expenses, and $17,666.67 to settle three HAV claims. [Dkt. No. 269] at 1-2. These damages were not "certain, or capable of being made certain" until the Court's ruling because the defendants disputed the amount, and "prejudgment interest cannot be awarded when the amount of damages cannot be ascertained except on conflicting evidence." Cataphora Inc., 848 F. Supp. 2d at 1072. As detailed in the October 1, 2021 Memorandum Opinion, VLM initially objected to the amount of damages on the ground that the attorneys' fees incurred to defend against the HAV claims were unreasonable [Dkt. No. 276] at 29-30, and it was not until June 25, 2021, which was after extensive discovery and motions practice, that it "conceded that the fees were reasonable." [Dkt. No. 268] at 12. VLM's eventual concession does not undermine the conclusion that the $3,548,292.90 figure required a judicial finding that the fees were reasonable. "[W]here the amount of damages cannot be resolved except by verdict or judgment, section 3287(a) prejudgment interest is not appropriate." Cataphora Inc., 848 F. Supp. 2d at 1072. For these reasons, § 3287(b) applies.

Because Sentinel paid for TSC's defense of the HAV claims (and the settlement of some HAV claims) when defendants failed to fulfil their duty to defend, indemnify, and hold TSC

harmless against those claims, Sentinel will be awarded prejudgment interest from November 1, 2019, the date Sentinel filed the Complaint in this civil action, in which Sentinel put defendants on clear notice that it was seeking to be indemnified.

### B. Attorneys' Fees

Sentinel also moves to recover the attorneys' fees and expenses it incurred in this action under the Patagonia-Sysco and Patagonia-ITI Agreements, which VLM concedes allow for the recovery of attorneys' fees incurred to enforce those agreements. [Dkt. No. 303] at 8. Although VLM is not a party to these agreements, as discussed in a previous opinion, it is "liable to Patagonia for the full amount of Patagonia's liability to Sentinel" based on the VLM-Patagonia Agreement. [Dkt. No. 277] at 2.

To recover its attorneys' fees and expenses, Sentinel has the burden of proving that its requested fees were reasonable and necessary. Sidya v. World Telecom Exchange Comms., LLC, 870 S.E.2d 199, 208 (Va. 2022). Courts in the Fourth Circuit have relied on a three-step framework to determine whether attorneys' fees are reasonable and necessary.[6] See, e.g., McAfee v. Boczar, 738 F.3d 81, 88 (4th Cir. 2013), as amended (Jan. 23, 2014). Under that framework, "a court must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 243 (4th Cir. 2009). Determining the "lodestar figure" is guided by twelve factors

---

[6] Because both the Patagonia-Sysco and Patagonia-ITI Agreements are governed by California law, and because this Court is sitting in diversity, California law would govern the issue of attorneys' fees if there were a conflict of laws. See E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 911 F. Supp. 2d 340, 359 (E.D. Va. 2012), abrogated on other grounds, 748 F.3d 160 (4th Cir. 2014), 564 F. App'x 710 (4th Cir. 2014). Because the parties have not identified any conflict between Virginia and California law on the issue, Virginia law will apply to the issue of attorneys' fees. See Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 101 (4th Cir. 2013).

adopted by the Fourth Circuit in <u>Barber v. Kimbrell's Inc.</u>, 577 F.2d 216, 226 n.28 (4th Cir. 1978) (citing <u>Johnson v. Georgia Hwy. Express Inc.</u>, 488 F.2d 714 (5th Cir. 1974)):

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

<u>Robinson</u>, 560 F.3d at 243 (quoting <u>Kimbrell's Inc.</u>, 577 F.2d at 226 n.28).  A court "need not address all twelve factors independently."[7] <u>Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship</u>, 730 F. Supp. 2d 513, 520 (E.D. Va. 2010).  After determining the lodestar, a court "should subtract fees for hours spent on unsuccessful claims unrelated to successful ones."  <u>Id.</u> (quoting <u>Grissom v. Mills Corp.</u>, 549 F.3d 313, 320 (4th Cir. 2008)).  Finally, a court should "award[] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff."  <u>Id.</u> (quoting <u>Grissom</u>, 549 F.3d at 321).

1. Lodestar Calculation

Sentinel was represented in this litigation by Kramon & Graham PA ("Kramon & Graham") and Wilson, Elser Moskowitz, Edelman & Dicker, LLP ("Wilson Elser").  It argues that the appropriate lodestar is $1,243,564.00 based on the following rates and hours, which it argues are reasonable:

---

[7] The parties generally agree that <u>Kimbrell's Inc.</u> factors four (opportunity costs), six (expectations), seven (time limitations), ten (case's undesirability), and eleven (relationship between attorney and client) have little, if any, bearing on the reasonableness of the pending fee petitions.

| KRAMON & GRAHAM | Hours worked | Hourly Rate | Year First Admitted | Position | Amount paid |
|---|---|---|---|---|---|
| Gollogly, Ezra S. | 1,055.40 | $345 | 2001 | Partner | $361,732.50 |
| Pomorski, Marysia A. | 1,024.75 | $260 | 2018 | Associate | $251,381.70 |
| Andrews, Henry A | 790.37 | $260 | 2015 | Associate | $193,220.70 |
| Harrington, William J. | 583.30 | $285 | 2013 | Associate | $164,399.40 |
| Lewis, Jean E. | 330.10 | $345 | 1990 | Partner | $110,624.25 |
| Ogburn, Lee H. | 116.70 | $435 | 1975 | Partner | $50,764.50 |
| Hughes Niazy, B. Summer | 77.10 | $285 | 2012 | Associate | $21,973.50 |
| Gibbs, Sheila R. | 52.40 | $285 | 2003 | Of Counsel | $14,934.00 |
| Evans, Beth P. | 7.50 | $285 | 2011 | Associate | $2,137.50 |
| Askew, Amy E. | 5.80 | $345 | 2001 | Partner | $2,001.00 |
| McSherry, M. Natalie | 0.30 | $345 | 1974 | Partner | $103.50 |
| Klepper, Steven M. | 0.20 | $345 | 2001 | Partner | $69.00 |
| **Total** | **4,043.92** | | | | **$1,173,341.55** |

| WILSON ELSER | Hours worked | Hourly Rate | Year Admitted | Position | Amount paid |
|---|---|---|---|---|---|
| Moore, Peter | 189.80 | $265 | 2008 | Partner | $43,752.58 |
| Sipes, Alexandra | 126.30 | $205 | 2016 | Associate | $23,451.27 |
| Ezeta, E. K. | 61.80 | $90 | n/a | Paralegal | $1,930.60 |
| Brahan, Richard | 6.20 | $205 | 2010 | Associate | $1,025.00 |
| Labas, M. | 2.60 | $90 | n/a | Paralegal | $63.00 |
| **Total** | **386.70** | | | | **$70,222.45** |

a. Reasonable Rates

To determine whether the rates for Sentinel's attorneys were reasonable, they must be compared to the appropriate hourly rates in the community where this civil action was litigated, which was Northern Virginia. See Cho v. Joong Ang Daily News Wash., Inc., No. 1:18-cv-1062, 2020 WL 1056294, at *4 (E.D. Va. Mar. 4, 2020). The customary rates for attorneys in Northern Virginia are delineated in the Vienna Metro matrix, which "accounts for [Kimbrell's Inc.] 'factors (3) skill required, (5) customary fee, (9) the experience, reputation, and ability of the attorney, and (12) fee awards in similar cases by providing a stable and consistent rate' for northern Virginia attorneys, 'based on their skill in commercial litigation cases and years of experience.'" Id. (quoting Gomez v. Seoul Gool Dae Gee Inc., No. 1:19-cv-1121, 2020 WL

354313, at *2 (E.D. Va. Jan. 21, 2020)); see also Vienna Metro LLC v. Pulte Home Corp., No.

1:10-cv-502, Dkt. 263 (E.D. Va. Aug. 24, 2011).

Even a brief comparison with the Vienna Metro matrix shows that the rates Sentinel's

attorneys charged were extremely low. The highest rate of any attorney at Kramon & Graham

was $435 per hour for Lee Ogburn, and although Ogburn is a partner who has been practicing

since 1975, he charged the same rate as a lawyer with 1-3 years of experience according to the

Vienna Metro matrix. The same is true of Peter Moore, a partner at Wilson Elser with over 10

years of experience, who charged only $265 per hour. It is telling that VLM's attorney's fees

expert, Bernard J. DiMuro, never opined that these rates were unreasonable. Instead, his only

critique was that the rates for Kramon & Graham were higher than those for Wilson Elser and

Patagonia's attorneys. Given how much lower the quoted rates were than those reflected in the

Vienna Metro matrix, the Court finds that all of plaintiff's claimed hourly rates were reasonable.

b. Reasonable Hours

Kimbrell's Inc. factors one (time and labor expended) and eight (the amount in

controversy and the results obtained) support a substantial recovery of fees and costs for

Sentinel. This action was litigated very aggressively by all sides for nearly three years, and

Sentinel ultimately was awarded the full recovery it sought for the costs and fees it incurred to

defend TSC against the HAV claims and settle three claims. VLM's expert agreed, stating that

"[w]ithout question, the amount in controversy was significant, and Sentinel did prevail on its

indemnity claims." [Dkt. No. 303-1] at ¶ 65.

Nonetheless, VLM argues that the lodestar should be reduced for several reasons.

VLM's primary argument is that Sentinel's fees should be reduced by half, or $621,782.00,

because half of Sentinel's fees were for pursuing an unnecessary equitable subrogation claim.

Sentinel correctly responds that it had to expend attorney time and costs on this issue because

VLM argued that equitable subrogation requires proof that someone is "primarily liable." See [Dkt. No. 303-1] at ¶20; Fed. Land Bank v. Joynes, 18 S.E.2d 917, 920 (Va. 1942). VLM argued that Sentinel should have known from the start that it could not prove that VLM or Patagonia were "primarily liable" for the HAV outbreak, because TSC did not effectively track its strawberries in the chain of commerce. This argument is unconvincing because, in fact, Sentinel did provide evidence of causation, including an expert, Dr. Melvin Kramer, who opined that VLM's and Patagonia's strawberries caused the HAV outbreak, as well as the U.S. Food & Drug Administration's investigation that concluded that the frozen strawberries served at the implicated TSC franchisees originated from the International Company for Agricultural Production and Processing ("ICAPP"), from whom VLM and Patagonia sourced TSC's strawberries. [Dkt. No. 276] at 10; [Dkt. No. 294] at 19. Moreover, even if Sentinel had not raised a claim of equitable subrogation, VLM's litigation strategy would have compelled Sentinel to conduct extensive discovery on causation because VLM repeatedly argued that its obligation to indemnify Sentinel under the express terms of the VLM-Patagonia Agreement was triggered only if Sentinel could establish that VLM's strawberries caused the HAV outbreak,[8] an argument that the Court ultimately rejected. [Dkt. No. 276] at 22. Accordingly, the amount of time Sentinel's attorneys spent on causation and equitable subrogation were not unreasonable.

VLM also challenges Sentinel's purported lack of billing judgment. For example, it argues that Sentinel's attorneys did not reduce fees "for staff services performed by attorneys, duplicative work and/or for services that are deemed inefficient," and that they block billed; however, VLM does not point to a single entry that has these deficiencies. To the contrary, the billing entries for Sentinel's attorneys appear specific and not block billed, with the vast majority

---

[8] See, e.g., [Dkt. No. 242] at 3-5.

13

of entries being for less than one-hour increments. In addition, Sentinel's counsel already "reduced its invoices to cut or eliminate excessive hours or non-billable tasks." [Dkt. No. 307] at 17. A review of Kramon and Graham's invoices shows, for example, that eight such "adjustments" were made in the month of March 2020, each reducing the amount of time billed. [Dkt. 294-4A] at SENT_BILS000087-000106. In addition, although VLM argues that Sentinel's fees should be reduced by $500,000—or roughly 1/3 of the requested fees—for redacted billing entries, that issue is moot because the Court has reviewed unredacted entries in camera. See [Dkt. No. 318].

Additionally, VLM argues that Sentinel spent an unnecessary amount of time researching and arguing that Quebec law should apply to the VLM-Patagonia Agreement, a position that was neither successful nor reasonable. In Virginia, a contract is generally interpreted according to the law of the place where the contract was made, and a contract is made where "the last act to complete it is performed." East West, LLC v. Rahman, 873 F. Supp. 3d 721, 728 (E.D. Va. 2012) (quoting Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005)). Sentinel took the position throughout this litigation that the "last act to complete" the VLM-Patagonia Agreement was VLM drafting and signing the Agreement, which occurred in Quebec, see, e.g., [Dkt. No. 214] at 22 n.7; however, that could not have been the last act, because VLM then sent the Agreement to California, where Patagonia accepted it. Because Sentinel has not proffered any evidence that VLM's actions in Quebec constituted anything more than an offer, and because it is rudimentary that an offer is not the "last act" in contract formation, Sentinel's efforts related to the application of Quebec law were unreasonable and its fees will be reduced accordingly.

Calculating the appropriate reduction is not an exact science. As VLM correctly argues, it is not possible to efficiently sift through hundreds of pages of billing entries to determine what fees are attributable to this issue. Instead, VLM suggests that the Court reduce Sentinel's fees by the same amount billed by Catherine Tyndale, Sentinel's expert on Canadian law, which was $34,090.39; however, VLM assumes that Sentinel's attorneys spent as much time researching Canadian law and arguing for its application as did Ms. Tyndale, which does not seem likely. It is more likely that Ms. Tyndale did the leg work to research the particulars of Quebec contract law, such as the contract's enforceability under Quebec law, while Sentinel's attorneys only needed to review those findings and incorporate them into their arguments before the Court. Indeed, a brief review of Sentinel's billing entries do not show a substantial number of entries devoted to the issue of Canadian law. Accordingly, the Court will reduce the lodestar amount not by $34,090.39 as VLM suggests, but by half that, for a total reduction of $17,045.20.

Although none of VLM's remaining arguments are persuasive, two bear mentioning. First, despite VLM's argument to the contrary, Sentinel is entitled to recover for the time and labor it expended attempting to intervene in an action brought by TSC against VLM and Patagonia in the Fairfax County Circuit Court for property damages, financial losses, and reputational harm resulting from the HAV outbreak. The state court rejected Sentinel's motion to intervene; however, Sentinel's attempt was not unreasonable. Consolidating the cases would have been efficient, because TSC's and Sentinel's claims concerned the same defendants—VLM and Patagonia—and the same subject matter—the HAV outbreak caused by tainted strawberries. In fact, VLM's attorney recognized that "consolidation for discovery might be a way for everybody to save expense and proceed fairly." [Dkt. No. 33-1] at 88. Second, VLM argues that the second Kimbrell's Inc. factor (novelty and difficulty of the questions) supports a fee

reduction, because the core question was a simple breach of contract issue that did not require significant discovery. Sentinel appropriately responds that the relationship between TSC and its distributors and suppliers was complex, and the various indemnity agreements were far from clear. Moreover, Sentinel did not request an unreasonable amount of discovery; rather, VLM increased the costs of discovery by opposing reasonable discovery requests, as evidenced by Sentinel having to file three motions to compel discovery, all of which were successful. [Dkt. No. 294] at 17.

In sum, Sentinel spent a reasonable number of hours to litigate this action, which involved over 75,000 documents, twenty witnesses, and a defendant—VLM—that vigorously opposed almost every allegation in plaintiff's complaint. Accordingly, Sentinel's proposed lodestar figure of $1,243,564.00 will be discounted by only $17,045.20, as discussed, for a resulting attorneys' fees award of $1,226,518.80.

## 2. Reductions for Unsuccessful Claims & Degree of Success

After determining the lodestar, a court "should subtract fees for hours spent on unsuccessful claims unrelated to successful ones," and "award[] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." Robinson, 560 F.3d at 243. Neither consideration requires further reduction of the lodestar figure. Although VLM argues that Sentinel's equitable subrogation claim was unsuccessful, that is inaccurate. No party moved for summary judgment on that claim, and the Court only dismissed it because Sentinel's counsel "acknowledged that if the Court granted [Sentinel's] recovery under Count I"— the claim for express indemnity—"Count II may be dismissed." [Dkt. No. 276] at 31. More importantly, Sentinel's claim for equitable subrogation was related to its claim for express indemnity, as both sought indemnity for the underlying HAV actions. That relationship justifies not reducing the fee because, "[w]here a lawsuit consists of related claims, a plaintiff who has

16

won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." Cho v. Joong Ang Daily News Wash., Inc., No. 1:18-cv-1062, 2020 WL 1056294, at *9 (E.D. Va. Mar. 4, 2020) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).  As for the degree of success, it cannot be disputed that Sentinel achieved a complete victory, because it got exactly what it asked for: the full amount of legal fees and costs it incurred to defend TSC against the HAV claims and to settle three claims.  Id. ("The degree of success is measured by two reference points, namely the amount sought at the outset of the litigation and the damages and relief awarded.") (quoting Matias Guerra v. Teixeira, No. TDC-16-0618, 2019 WL 3927323, at *9 (D. Md. Aug. 20, 2019)).  For all these reasons, the Court will award Sentinel attorneys' fees in the amount of $1,226,518.80.

### C. Costs and Expenses

Sentinel also seeks the costs and other expenses listed in the following chart:

| Description | Amount |
|---|---|
| **Expert Witnesses** | |
| EHA Consulting Group, Inc. (Dr. Kramer) | $152,337.15 |
| Bonner Kiernan (Mr. Trebach) | $80,700.00 |
| Alan Gray LLC[18] | $11,194.00 |
| Clyde & Co. Canada LLP (Ms. Tyndale) | $34,090.39 |
| RdR Solutions Consulting (Dr. Hutt) | $4,740.00 |
| **Other Costs** | |
| Deposition reporter/transcript fees (28 U.S.C. § 1920(2) | $35,274.80 |
| Printing and copying costs and the costs of making copies of any materials where copies are necessarily obtained for use in the case[19] (28 U.S.C. § 1920(3) and (4)) | $4,624.28 |
| Mediation costs | $2,067.08 |
| Filing fees and clerk fees (28 U.S.C. § 1920(1)) | $951.50 |
| Delivery, travel, and messenger fees | $407.58 |
| Dictionary purchases | $141.50 |
| Compensation of interpreter (28 U.S.C. § 1920(6)) | $40.00 |
| **Total** | **$326,568.28** |

VLM does not appear to challenge the legal basis to award these expenses.  The broad language of the Patagonia-Sysco and Patagonia-ITI Agreements allows Sentinel to recover "any" and "all" litigation "expenses" from Patagonia, and those expenses will be passed along to VLM because VLM is "liable to Patagonia for the full amount of Patagonia's liability to Sentinel." [Dkt. No. 276] at 30; [Dkt. No. 277].  In addition, both California and Virginia law allow a prevailing party to recover expenses in a breach of contract action when those expenses are pled and proved.  See Coady v. Strategic Res., Inc., 525 S.E.2d 273, 274 (Va. 1999); Hsu v. Semiconductor Sys., Inc., 25 Cal. Rptr. 3d 82, 90-91 (Cal. Ct. App. 2005).  That occurred here, because Sentinel claimed in its Third Amended Complaint that it was seeking, among other things, "the costs and expenses . . . that [Sentinel] paid and continues to incur to enforce the terms of the Patagonia Hold Harmless Agreement and the ITI Agreement," [Dkt. No. 131] at 12, and sought the same in its motion for summary judgment, [Dkt. No. 214] at 29-30.

Instead, VLM focuses on the reasonableness of these expenses, arguing primarily that the experts were "entirely unnecessary." [Dkt. No. 303] at 11.  The only unnecessary expert was Catherine Tyndale, a Quebec lawyer whom Sentinel retained to offer an opinion on the laws of Quebec.  As discussed above, it was not reasonable for Sentinel to argue that the "last act" to complete the VLM-Patagonia Agreement occurred in Quebec when the contract was accepted by Patagonia in California.  Accordingly, there was no reasonable basis to argue that Quebec law applied, and therefore Sentinel cannot recover the $34,090.39 it incurred to retain Ms. Tyndale. Retaining the other experts was reasonable.  Specifically, it was reasonable for Sentinel to retain Dr. Kramer, who offered an expert opinion on causation, because his opinion was necessary not only to support Sentinel's equitable subrogation claim, but also to counter VLM's argument that VLM's indemnity obligations were only triggered if VLM's product actually caused the HAV

outbreak.  Barry Trebach, who opined on the reasonableness of the fees and costs in the HAV

litigation, was needed because Sentinel bore the burden of proving that reasonableness.  Dr.

Catherine Hutt was needed to opine on the reasonableness of TSC's response to the HAV

outbreak, because her opinion was necessary to rebut Patagonia's assertion that TSC's

negligence contributed to the outbreak.  Because VLM does not appear to contest any other

expenses in Sentinel's chart, such as the costs for transcripts, mediation services, and even

"Dictionary purchases," the Court will only reduce Sentinel's proposed expenses by the amount

for Ms. Tyndale, which was $34,090.39.  Accordingly, Sentinel is entitled to expenses in the

amount of $292,477.89.

### III. PATAGONIA'S FEE PETITION

Patagonia moves to recover $253,491.95 in attorney's fees and expenses from VLM

under the terms of the VLM-Patagonia Agreement.  Of that amount, Patagonia incurred

$224,103.95 to defend itself in this action and $29,388.00 to defend itself in the underlying state

litigation. VLM does not claim that the amount of fees and expenses is unreasonable; however, it

opposes any award of fees because the VLM-Patagonia Agreement does not allow Patagonia to

recover fees and costs associated with enforcing that Agreement.  Patagonia concedes this point.

Indeed, the Agreement requires VLM to indemnify Patagonia against "all action[s], suits, . . .

[and] costs and expenses (including reasonable attorney's fees), resulting therefrom," when those

actions are "brought or commenced by any person or entity against" Patagonia in certain

circumstances.  [Dkt. No. 204-3] at 3 (emphasis added).  It does not contain the same expansive

language as the Patagonia-Sysco Agreement, for example, which required Patagonia to

indemnify Sentinel against "[a]ll actions, suits, . . . [and] costs and expenses (including

reasonable attorneys' fees) resulting therefrom, including but not limited to enforcement of the

terms of this Hold Harmless Agreement and Guaranty/Warranty of Product . . . ."[9]  [Dkt. No. 214-2].  Patagonia argues that the amount of fees it incurred to enforce the Agreement is only a small percentage of its overall fee request—specifically, only $6,603.00, which are the fees associated with filing a crossclaim and bringing a motion for summary judgment against VLM.  Patagonia correctly points out that it incurred the remaining fees to defend against Sentinel's claims, and that the VLM-Patagonia Agreement allows it to recover those fees and costs.  The Court agrees and will therefore reduce Patagonia's fee request by only $6,603.00.

VLM's remaining arguments are meritless.  First, it argues that the Court should not consider Patagonia's motion until the Court resolves VLM's crossclaim for indemnification against Patagonia; however, because the Court resolved that crossclaim in Patagonia's favor on May 19, 2022, this argument has become moot.  Second, VLM argues that Patagonia waived its right to seek fees when its counsel stated in a phone call that Patagonia would not be seeking fees or costs from VLM in this action.  In response, Patagonia clarified that it only offered to drop its request for attorney's fees to promote a settlement, and that it was not making an absolute promise to drop such a request if the action did not settle.  [Dkt. No. 305] at 2.  Because there is no record of the phone call other than the parties' conflicting recollections, there is insufficient evidence of a waiver.  Although VLM claims that it did not seek discovery of Patagonia's fees and costs because of Patagonia's representation, Patagonia correctly points out that any detriment is minimal, because Patagonia has reiterated its desire to seek fees and costs throughout this litigation and provided VLM with its bills for the fees and costs on October 8, 2021, which was nearly two weeks before Sentinel provided VLM its bills and nearly three

---

[9] The Patagonia-ITI Agreement has similar language allowing Sentinel to recover fees associated with enforcing the Agreement.  See [Dkt. No. 214-4].

months before VLM had to file its memorandum in opposition to Patagonia's motion. <u>See</u> [Dkt. No. 305] at 4.

Accordingly, Patagonia will be awarded $246,888.95 in fees and costs.

## IV. CONCLUSION

For the reasons stated above, Sentinel's Motion for Attorneys' Fees and Expenses and Prejudgment Interest Calculation [Dkt. No. 293] and Patagonia's Motion for an Award of Attorney's Fees and Litigation Costs [Dkt. No. 295] will be granted in part and denied in part by an appropriate Order to be issued with this Memorandum Opinion.

Entered this _20_ day of October, 2022.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge